**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LEROY DONALD BRAHM, III | : | |
| | : | |
| Appellant | : | No. 1575 EDA 2024 |

Appeal from the Judgment of Sentence Entered April 22, 2024
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0001051-2022

BEFORE: MURRAY, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY KING, J.:                                    **FILED JUNE 17, 2025**

Appellant, Leroy Donald Brahm, III, appeals from the judgment of sentence entered in the Chester County Court of Common Pleas, following his jury trial convictions for first degree murder, and four counts each of aggravated assault, simple assault, and recklessly endangering another person ("REAP").[1]  We affirm.

The trial court thoroughly and thoughtfully provided a detailed recitation of the facts underlying this matter, which we adopt herein.  (**See** Trial Court Opinion, 12/4/24, at 2-15).  We summarize the facts most pertinent to this appeal as follows.  Annabel Rose Meenan met Appellant when she was 17 years old, still a senior in high school, and he was 27.  Upon graduation, she moved in with Appellant.  Both Ms. Meenan's mother, Jill Hunsberger, and her

_____

[1] 18 Pa.C.S.A. §§ 2502(a), 2702, 2701, and 2705, respectively.

father, Brian Meenan, noticed changes in their daughter after this time. She communicated with her parents less and often cancelled planned meetings.

In March 2020, Ms. Meenan and Appellant met Kevin Walter and developed a friendly relationship with him. The three would go out for dinner and drinks or hang out and use drugs at Appellant and Ms. Meenan's home. They began to spend time together every weekend. After approximately one month, the relationship became sexual, with Appellant inviting Mr. Walter to have sex with Ms. Meenan while Appellant watched and told her what to do.[2] This sexual arrangement continued for some time.

Mr. Walter observed Appellant verbally abuse Ms. Meenan, calling her names, forcing her to clean up spills on her hands and knees, or choking and slapping her during intimacy. In August 2021, Ms. Meenan and Mr. Walter's relationship began to develop romantically and independently of Appellant, as they spoke on Snapchat or other social media every day. They began to see each other in person without Appellant present.

In September 2021, Appellant and Ms. Meenan invited Mr. Walter to join them on a cruise, where the three shared a room. However, after Appellant discovered Mr. Walter and Ms. Meenan alone in the room, he became enraged and accused them of being intimate without him. After that, the relationship was never the same.

Around this time, Ms. Meenan's work supervisor, Eileen Lang, became

_____

[2] Mr. Walter and Appellant were not intimate with each other outside of their mutual involvement with Ms. Meenan.

concerned about Ms. Meenan due to her inconsistent attendance and a text message purportedly sent from Ms. Meenan's phone that did not sound like her. On October 13, 2021, Ms. Lang called 911 and asked them to do a well check at Ms. Meenan's home, although officers did not discover anything wrong.

Also in October 2021, Mr. Walter began communicating with Ms. Meenan on a third-party texting application, Text Now. Ms. Meenan visited Mr. Walter approximately four times at his apartment and they began to make plans for Ms. Meenan to leave Appellant and move in with Mr. Walter, or to go with him when he eventually left the state. Appellant discovered that they were still speaking and ordered Ms. Meenan to block Mr. Walter's phone communication with her.

During the weekend of October 29, 2021, through October 31, 2021, Ms. Meenan told Appellant that she was visiting her grandmother, but she stayed with Mr. Walter at his apartment. Appellant became suspicious and, after discovering Ms. Meenan's car at a parking lot close to where Mr. Walter lived, went to Mr. Walter's apartment and began to bang on the doors and climb the apartment balcony. During this confrontation Appellant was angry, aggressive, and loud, and scared Ms. Meenan, who ran and hid in the closet. Police were called and Ms. Meenan returned home with Appellant, telling Mr. Walter that everything would be okay. This was the last time Mr. Walter saw Ms. Meenan alone.

Subsequently, officers answered several calls in which Appellant and Ms.

- 3 -

Meenan reported Mr. Walter to the police for allegedly harassing her, including after an incident in which Mr. Walter attempted to send them a round of drinks at the Black Horse Tavern as an apology. However, officers were unable to speak to Ms. Meenan alone regarding the accusations, and ultimately, no charges were filed.

On November 6, 2021, following one such report, home security cameras[3] captured Appellant, at 1:49 a.m., punching the bedroom door and dresser and yelling at Ms. Meenan. (*See* Commonwealth's Ex. 165, Clip 1). At 4:08 a.m., Ms. Meenan walked down the hall and into the bedroom, uninjured. (*See* Commonwealth's Ex. 165, Clip 2). At 4:44 a.m., Ms. Meenan again entered the bedroom, now limping and rubbing the lower portion of her left leg. (*See* Commonwealth's Ex. 165, Clip 3). At 5:17 a.m., Ms. Meenan got out of bed, limping and having difficulty walking, using the furniture and walls to assist her movement. (*See* Commonwealth's Ex. 165, Clip 4).

On November 15, 2021, Ms. Lang observed Ms. Meenan limping at work. Ms. Meenan explained that she had been kicked by a girl at a bar. Ms. Lang did not believe this explanation and urged Ms. Meenan to get her leg x-rayed. Subsequently, a physician's assistant diagnosed Ms. Meenan with a broken left fibula. Upon hearing this news, Ms. Meenan became visibly upset and started to cry.

_____

[3] Appellant had two home security systems. One system was a Zmodo hard-drive based system which recorded in black and white when there was no natural light, and did not record sound. The second system, SimpliSafe, a cloud-based service, did record sound.

On November 22, 2021, Appellant sent Mr. Walter a "cease and desist" letter from his lawyer stating that Mr. Walter should not contact Ms. Meenan or Appellant.

On November 23, 2021, at approximately 3:00 a.m., Donald Dehaven, the park manager of the Creekview Community, heard a commotion coming from Appellant and Ms. Meenan's residence, which was located directly behind his. Mr. Dehaven heard a woman screaming and saying, "Stop it, it hurts, let me call my father." (N.T. Trial, 2/6/24, at 124). Mr. Dehaven called the police and went to Appellant's front door, where he heard something fall to the floor. After hearing a woman saying, "Someone's at the door" but otherwise receiving no response, he called 911 again. (*Id.* at 125). However, no one opened the door either for Mr. Dehaven, or the police officers who arrived to investigate.

Home security footage from November 23, 2021 revealed that inside the home, around 2:19 a.m., Ms. Meenan crawled into the front bedroom. (*See* Commonwealth's Ex. 167, Clip 1, 00:00-07:50). Appellant threw pots and other household items at her as she attempted to hide behind a clothing rack. (*See id.*) Appellant came into the room and hit at the clothing rack with a pan and other objects. (*See id.*) At 2:43 a.m., Appellant pushed Ms. Meenan into the master bedroom and continued to yell at her. (*See id.*, Clip 2, 00:00–00:26). Appellant appeared to kick or hit her while she was on the floor out of sight of the camera, before chasing her out of the bedroom again. (*See id.* Clip 2, 00:57-01:06). At 2:45 a.m., Ms. Meenan returned to the

- 5 -

front bedroom and appeared to be holding a keychain with pepper spray or mace, which she pointed at Appellant as he followed her. (*See id.* Clip 3, 00:00-01:24). At 3:01 a.m., in the master bedroom, Appellant grabbed Ms. Meenan's head and threw her on the bed, where he repeatedly punched and choked her. (*See id.* Clip 4, 00:00–00:39).

On November 30, 2021, Ms. Lang observed a "bright blue" bruise on Ms. Meenan's chin. (N.T. Trial, 2/8/24, at 52). Ms. Lang asked if anyone was hurting her, but Ms. Meenan denied it. Later that day, Ms. Meenan met her father for lunch. Mr. Meenan noticed she appeared disheveled and out of sorts and wore a cast/boot. When questioned, Ms. Meenan explained that she had fallen down the steps. That evening, Mr. Meenan received a disturbing phone call from Appellant. Appellant told Mr. Meenan explicit details about his sexual life with Ms. Meenan and their involvement with Mr. Walter, while she sobbed in the background.

On December 1, 2021, Ms. Meenan and Mr. Walter spoke on Text Now and Mr. Walter informed her that his feelings for her were real. Ms. Meenan texted Mr. Walter a screenshot of the x-ray of her broken leg. Mr. Walter responded, "Jesus," to which Ms. Meenan replied, "IKR?" [meaning, "I know, right?"] (N.T. Trial, 2/7/24, at 161).

On December 2, 2021, Ms. Lang heard Ms. Meenan sobbing at the front desk of their office. When Ms. Lang asked her what was wrong, Ms. Meenan stated that Appellant was giving her clothes away to another girl.

On December 3, 2021, Ms. Meenan came to work 1 hour and 45 minutes

late, again crying and visibly upset. Concerned, Ms. Lang asked Ms. Meenan to spend the night at her home instead of returning to Appellant, but Ms. Meenan declined the offer.

That same morning, Mr. Walter began receiving messages on Text Now from someone who he at first believed was Ms. Meenan. The conversation continued sporadically that day, but later in the evening, as the messages became more taunting and obscene, and less like things Ms. Meenan would say, Mr. Walter realized that he was speaking to Appellant. The messages continued into the morning of December 4, 2021.

On the night of December 3, 2021, at approximately 7:00 p.m., Ms. Meenan and Appellant went to the Black Horse Tavern. When they left the house Ms. Meenan had no evidence of bruising on her body.[4] At the tavern, Appellant complained to a bartender at the Black Horse Tavern, Alexa Peters, about Mr. Walter and how he had betrayed Appellant's trust. Ms. Peters served Appellant and Ms. Meenan alcohol (approximately 12 drinks), soda, and food.[5] Although neither Ms. Meenan nor Appellant appeared visibly intoxicated, Appellant became louder as the night progressed, before they left by 11:00 p.m. to return home.

_____

[4] Still photographs taken from the home security footage, as well as the testimony of Ms. Peters, confirm that Ms. Meenan was not visibly injured at that time.

[5] The drinks at the Black Horse Tavern are one-ounce shots, but Appellant asked that the drinks be split into two glasses. However, Ms. Peters could not recall if Appellant ordered singles or doubles.

At 11:44 p.m., Appellant received a text message from Mr. Walter. Mr. Walter told Appellant, "Good luck to you and try not to hurt her too bad," and forwarded the screenshot of Ms. Meenan's x-ray. (N.T. Trial, 2/7/24, at 187). Minutes after receiving that text message, Appellant's home security systems captured him brutally assaulting Ms. Meenan throughout the course of the next two hours.[6]

Specifically, the security systems captured the following series of events. At 11:52 p.m., Appellant left his bedroom, went into the living room, and struck Ms. Meenan repeatedly, punching, kicking, and stomping on her. (*See* Commonwealth's Ex. 176, Clip 1, 00:00–02:08). At 11:54 p.m., Ms. Meenan attempted to escape to the front bedroom, where Appellant followed and struck her with an object before dragging her back out to the living room to continue the assault. (*See id.* Clip 2, 00:00–00:26; Clip 3, 00:00–02:38). At 11:57 p.m., Ms. Meenan again attempted to escape to the front bedroom as Appellant threw objects at her. (*See id.* Clip 4, 00:00–00:51). Appellant came in and out of the room multiple times to continue yelling at Ms. Meenan and assaulting her while she cowered in the corner. (*See id.* Clip 4, at 00:51–02:39). At 11:59 p.m., Appellant flipped over the coffee table before hitting, punching, and stomping on Ms. Meenan. (*See id.* Clip 4, at 02:39–03:06).

At 12:18 a.m., Ms. Meenan attempted to crawl across the kitchen floor

---

[6] The security footage was introduced to the jury in several of the Commonwealth's exhibits, which are contained within the certified record. This Court has reviewed all trial exhibits, including said footage.

away from Appellant as he continued to kick and punch her.  (***See id.*** Clip 5, 00:00–03:04).  By 12:25 a.m., Ms. Meenan's face was visibly injured.  (***See*** N.T. Trial, 2/9/24, at 38, Commonwealth's Ex. 200).  By 1:09 a.m., Appellant had thrown Ms. Meenan's clothes all over the floor of the kitchen while he continued assaulting her in the living room.  (***See*** Commonwealth's Ex. 176, Clip 6, 0:00–02:22).

At approximately 1:31 a.m., Appellant lay in bed texting someone.  (***See id.*** Clip 7, 00:00–01:40).  At 1:35 a.m., Appellant returned to the kitchen and smashed Ms. Meenan's phone while she cried and begged him to call her father.  (***See id.*** Clip 7, 01:42–04:24; N.T. Trial, 2/9/24, at 40-43, Commonwealth's Ex. 201, 202).

At 1:50 a.m., Appellant, who had been in bed texting again, returned to the living room to continue his brutal assault of Ms. Meenan.  (***See*** Commonwealth's Ex. 176, Clip 8, 00:58–02:23).  He knocked her to the ground and continued to punch, kick, and jump on top of her.  (***See id.*** Clip 8, 02:23–13:15).  Ms. Meenan fell to the floor, where Appellant continued to strike and kick her as she attempted futilely to protect herself.  (***See id.***)  Around 2:06 a.m., Appellant overturned the couch on top of Ms. Meenan and appeared to jump or sit on the couch.  (***See id.*** at 15:53–16:11).  After this, Ms. Meenan did not again appear on camera moving under her own volition.

Appellant left Ms. Meenan motionless on the floor and did not return to his bed after that time.  The next instance he appeared on camera, around 6:40 a.m., Appellant began to clean up the house, changed his clothes, and

returned the couch to its proper place. He wiped Ms. Meenan with a towel and moved her body. (***See id.*** Clip 9, 06:40-07:02).

At 7:06 a.m., almost 30 minutes after waking, Appellant called 911. He identified himself as Ms. Meenan's boyfriend and stated that they had been drinking a lot the night before and he could not wake her. According to Appellant, he had found Ms. Meenan face down on the living room floor. Appellant stated that she could be choking and was cold to the touch. The dispatcher instructed Appellant to perform CPR, and Appellant indicated that he did not think Ms. Meenan was breathing, felt cold, and made a gurgling sound when he performed CPR.

Ambulance and police arrived at the scene at 7:12 a.m., approximately four to five minutes after dispatch. At that time, Appellant was not performing CPR and stood in the doorway of the home. Upon entry, Officer Shawn Michinock, who was familiar with the couple from prior calls, observed Ms. Meenan's bruised body on the floor, dressed only in her underwear. She was cold to the touch, and he could not detect a pulse. It appeared to Officer Michinock that Ms. Meenan was dead.

Paramedics also observed Ms. Meenan laying on the floor in an unnatural position: face up, her arms next to her body and her legs perfectly straight. She had suffered significant blunt force injuries, including lacerations, bruises in various states of healing all over her body, her eyes swollen, including one swollen shut, and blood and what appeared to be cat litter matted in her hair. They observed odd long, thin, markings on her back. Ms. Meenan was not

- 10 -

breathing, cool to the touch, and showed no signs of life. She had areas of dependent lividity[7] on her body, and her pupils were fixed and nonreactive, which both paramedics believed indicated that she was deceased. Nevertheless, paramedics immediately attempted lifesaving measures and continued those efforts for the next 30 minutes, while other police officers arrived on scene.

Mr. Lex questioned Appellant about the bruising on Ms. Meenan's body, and Appellant responded repeatedly that it was the result of "rough sex" or "a sexual kink" or it was "just sexual." (N.T. Trial, 2/5/24, at 96-97, 138, 155). Both Officer Michinock and the paramedics found Appellant's demeanor strange: at times nervous and frantic with outbursts of "crying noises" and repeating that "it wasn't his fault," before acting "oddly" calm. (*See id.* 155-56). At one point Appellant stated, "Oh, she's not going to wake up, is she?" (*See id.* 155). As Mr. Lex and Ms. Slaughter moved Ms. Meenan's body onto a stretcher, they noticed a 6-inch round spot of wet blood beneath her. They transported Ms. Meenan to the Phoenixville Hospital, where she was pronounced dead shortly after arrival.

_____

[7] Ms. Meenan's back appeared darker than her chest and torso. Both Matthew Lex, the lead paramedic, and his partner, Molly Slaughter, explained that blood pools to the lowest part of the body if the heart is not pumping it. Based on the lividity of Ms. Meenan's body, Ms. Slaughter assumed that she had been moved post-mortem, possibly multiple times. Brittany Gavin, the Chester County assistant coroner, also testified regarding her belief that, based upon the patterns of fixed and non-fixed lividity, Ms. Meenan had died on her front but had been moved to her back after death.

Officer Michinock transported Appellant to the police station while Detective Gary Lynch and other officers processed the scene. The home was in disarray, with broken and overturned furniture and cat litter boxes, a smashed cell phone, which Appellant claimed had been dropped, a broken laptop, a shattered oven door, and numerous instances of what appeared to be smeared or splattered blood. Crime scene technicians swabbed and confirmed the presence of blood, some of which was later definitively proven to belong to Ms. Meenan.

Detective Christine Bleiler obtained search warrants for the home surveillance systems, which she felt was important to do quickly to prevent the remote deletion of evidence. She also examined and spoke to Appellant shortly after his arrest and observed bloodstains on his clothing, as well as bruising and swelling of his right hand, the middle finger of his right hand, and his right ankle. While Detective Bleiler examined him, Appellant stated, "I am going to jail, aren't I?" and "my life is over." (*See id.* at 247).

Subsequent to his arrest, Appellant spoke to his father from jail and requested that his father unplug the black box, or modem, at his house. In response, Appellant's father told him not to talk about anything. In a second recorded call, Appellant stated that they had waited too long to handle the router. Appellant's father told him to shut up and to not talk about the case or his house.

On March 8, 2023, Appellant filed a motion seeking to suppress statements to police where he provided the passcode to his phone, as well as

the December 6, 2021 warrants for the Zmodo and SimpliSafe footage seized from his home security systems.

Following a hearing, on June 27, 2023, the trial court found that the officers' request for Appellant's phone passcode was a violation of **Miranda**,[8] and suppressed that statement; however, the court did not suppress the evidence recovered from the phone as it would have been inevitably discovered through other means. The court denied suppression of evidence seized in connection with the search warrants, finding that the warrant related to Appellant's cellphone did not lack particularity, and the warrants related to the security system were not overbroad.

On February 5, 2024, the case proceeded to a jury trial. In addition to the testimony of Ms. Meenan's family members and associates, police officers, and paramedics, Detective Bleiler testified regarding the home security footage obtained through warrants, as well as text messages between Appellant and Ms. Meenan that showed the controlling nature of the relationship and Appellant's efforts to cover up the real cause of Ms. Meenan's broken leg.

Additionally, Dr. Gary Collins, a medical examiner who performs forensic pathology services for the Chester County Coroner's Office, testified regarding the autopsy he performed on Ms. Meenan, including the numerous bruises, lacerations, abrasions, and fractured ribs she had suffered while she was still

---

[8] **Miranda v. Arizona**, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966).

J-S17031-25

alive, none of which were caused by CPR compressions. Ultimately, Dr. Collins determined that Ms. Meenan's cause of death was cardiac arrest following physical assault while intoxicated with cocaine and ethanol, and the manner of her death was homicide. In Dr. Collins' opinion, the significant amount of stress and pain Ms. Meenan had suffered as a result of her injuries, fat emboli in her lungs indicating blunt force trauma, and his review of the surveillance footage and the toxicology report all supported this determination. Dr. Collins also explained that Ms. Meenan's death would have appeared differently if it had been caused solely by drug intoxication, rather than a cardiac arrest as the result of a physical assault.

Michael Lamb, a forensic toxicology expert, testified regarding his analysis of Ms. Meenan's blood. She had consumed alcohol, not at a lethal level, and cocaine. Mr. Lamb testified that it is difficult to determine the impact of the cocaine as each person has a different tolerance and processing capacity. However, Ms. Meenan's concentration was 69 ng/ml, while the average concentration of cocaine in 37 cocaine-related fatalities was 4,600 ng/ml, with a range of 40 ng/ml to 31,000 ng/ml.

On February 9, 2024, the jury convicted Appellant of the aforementioned charges. On April 22, 2024, the court sentenced Appellant to a mandatory term of life imprisonment without parole, and a consecutive term

of 18 to 40 years of incarceration.[9]  On May 1, 2024, Appellant timely filed post-sentence motions, including a motion for a judgment of acquittal, and a motion to vacate his sentence and for a new trial.  On May 6, 2024, the court denied the motions.

On June 4, 2024, Appellant timely filed a notice of appeal.  On June 5, 2024, the court ordered Appellant to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal.  Following an extension, Appellant timely complied on July 26, 2024.

On appeal, Appellant raises the following issues for our review:

1. Whether the trial court erred or committed an abuse of discretion by denying Appellant's Motion to Suppress, in concluding that the search warrants for the Zmodo and Simplisafe home surveillance video were not overly broad?

2. Whether there was insufficient evidence through expert testimony that Appellant committed the offense of murder by causing the death of the decedent beyond a reasonable doubt?

(Appellant's Brief at 7).

In Appellant's first issue, he argues that the two warrants for the Zmodo hard drive, and the two warrants for the SimpliSafe cloud-based video storage, were overly broad.  Specifically, Appellant contends that the affiant could not establish a nexus between the item to be searched and the suspected crime committed, permitting the affiant to obtain "any and all"

_____

[9] The four counts each of aggravated assault, simple assault, and REAP relate to the events of November 6, 2021, November 23, 2021, December 3, 2021, and December 4, 2021.

digital files of Appellant's interior home life, which he asserts was an impermissible intrusion into his private affairs. Further, Appellant insists that the subsequent warrants seeking the digital files that the affiant had already obtained through the first warrant could not cure the constitutional violation. As a result, Appellant asserts that the trial court should have granted his suppression motion and requests that this Court grant relief. We disagree.

Preliminarily, we must determine whether Appellant has preserved this issue for our review.

> The fundamental tool for appellate review is the official record of what happened at trial, and appellate courts are limited to considering only those facts that have been duly certified in the record on appeal. To ensure that the appellate courts have all necessary records, the Pennsylvania Rules of Appellate Procedure provide for the transmission of certified records from trial courts to appellate courts.

> \* \* \*

> [Pa.R.A.P. 1911] makes it clear that appellants must order all transcripts necessary to decide the appeal, and that the Superior Court may take any action it deems appropriate, including dismissal of the appeal, if the appellant does not order the necessary transcripts.

*Commonwealth v. Gillen*, 798 A.2d 225, 229 (Pa.Super. 2002) (quoting *Commonwealth v. Williams*, 552 Pa. 451, 456-457, 715 A.2d 1101, 1103-1104 (1998)). It is the **appellant's** responsibility to order all transcripts necessary for appellate review. *Commonwealth v. Steward*, 775 A.2d 819, 833-34 (Pa.Super. 2001) (holding that appellant is responsible to order all transcripts necessary for review) (emphasis added). Further, "it is

- 16 -

unreasonable to expect the court reporter to transcribe all of the proceedings simply because the appellant asks the court reporter to "produce, certify, and file transcript in the matter...." *Gillen, supra* at 229 n.4. If an appellant wishes all of the notes to be transcribed, "or in particular the suppression notes of testimony, then he should [so indicate] in his order [for transcripts]." *See id.*

Instantly, the notes of testimony from the suppression hearing are not included in the certified record. Following an inquiry, this Court confirmed that the notes of testimony from the suppression hearing were **not** transcribed, nor were they requested. An examination of the certified record indicates that on June 4, 2024, contemporaneous with his notice of appeal, Appellant filed a request for transcripts requesting that "the official court reporter is hereby requested to produce, certify, and file the transcripts in the matter in conformity with Rule 1922 of the Pennsylvania Rules of Appellate Procedure." The request did not specify the dates, nor the specific proceedings requested.

On August 19, 2024, the trial court entered an order noting that it could not address some of Appellant's issues on appeal due to the lack of transcripts. (*See* Order, 8/19/24). The court ordered that Appellant must order and pay for transcripts within 30 days of the date of the order, and that failure to do so would result in Appellant's sufficiency and weight challenges being waived on appeal. (*See id.*) On September 11, 2024, this Court received a notice from the trial court that Appellant had not ordered the transcripts, and that

the trial court had officially requested transcription itself. (**See** Trial Court Update, 9/11/24). The notice attached a transcript request for "the entire proceeding" but did not specify requests for either pre- or post-trial hearings. (**See id.**)

Under these circumstances, we conclude that Appellant failed to "specify precisely which notes he sought transcription of, indicate all notes were to be transcribed, or in any other manner identify the suppression transcript." **See Gillen, supra** at 229. In other words, Appellant's request for transcripts was insufficient to notify the stenographer that Appellant wished to have the notes from the suppression hearing transcribed and transmitted to this Court. As the suppression hearing transcript is necessary to conduct our appellate review, Appellant's first issue is waived on appeal.[10] **See id.**

Moreover, even if Appellant's suppression claims were not waived, they would not merit relief. The following principles govern our review of an order denying a motion to suppress:

> An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because

---

[10] We acknowledge that Appellant does not directly dispute the testimony adduced at the suppression hearing; rather, he attacks the court's legal conclusions. Nevertheless, even if we could accept as true the trial court's summary of the testimony at the suppression hearing, we would still need to review the transcript for other purposes such as confirming that Appellant preserved the suppression related arguments that he now advances on appeal.

the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

*Commonwealth v. Ford*, 175 A.3d 985, 989 (Pa.Super. 2017), *appeal denied*, 647 Pa. 522, 190 A.3d 580 (2018).

Both the United States Constitution and the Pennsylvania Constitution protect citizens from unreasonable searches and seizures. *See* U.S. Const. amend. IV; Pa. Const. art. 1, § 8. These constitutional protections require that warrants "(1) describe the place to be searched and the items to be seized with specificity and (2) be supported by probable cause to believe that the items sought will provide evidence of a crime." *Commonwealth v. Johnson*, 662 Pa. 691, 706, 240 A.3d 575, 584 (2020).

An overbroad warrant is "unconstitutional because it authorizes a general search and seizure." *Commonwealth v. Young*, 287 A.3d 907, 919-20 (Pa.Super. 2022), *appeal denied*, ___ Pa. ___, 303 A.3d 110 (2023). Therefore, while an overbreadth analysis "begins with an assessment of probable cause," we must also examine whether the warrant described the place to be searched and item seized with sufficient specificity. *See*

*Commonwealth v. Green*, ___ Pa. ___, ___, 265 A.3d 541, 549 (2021). The Pennsylvania Constitution requires that the warrant describe the items seized "as nearly as may be," a more stringent requirement than that of the Fourth Amendment, which "nearly requires particularity in the description." *Commonwealth v. Ani*, 293 A.3d 704, 715-16 (Pa.Super. 2023).

Our Supreme Court has outlined the relevant legal standards for an overbreadth challenge:

> [F]or particularity purposes, we have clarified that although some courts have treated overbreadth and ambiguity as relating to distinct defects in a warrant, both doctrines diagnose symptoms of the same disease: a warrant whose description does not describe as nearly as may be those items for which there is probable cause. For that reason, when assessing the validity of the description contained in a warrant, the natural starting point for a court is to determine for what items probable cause existed. The sufficiency of the description [in the warrant] must then be measured against those items for which there was probable cause. Any unreasonable discrepancy between the items for which there was probable cause [to search] and the description in the warrant requires suppression. This is because [a]n unreasonable discrepancy reveals that the description was not as specific as reasonably possible[,] meaning the warrant is overbroad, ambiguous, or perhaps both.
>
> At the same time, we have also recognized the fact-dependent nature of such claims, and cautioned that search warrants should be read in a common sense fashion and should not be invalidated by hypertechnical interpretations. This may mean, for instance, that when an exact description of a particular item is not possible, a generic description will suffice. In that vein, we have held that where the items to be seized are as precisely identified as the nature of the activity permits and an exact description is virtually impossible, the searching officer is only required to describe

the general class of the item he is seeking.

***Johnson, supra*** at 706-08, 240 A.3d at 584-85 (internal citations and quotations omitted).

In ***Young***, this Court discussed methods of curing overbroad warrants, both with incorporated, and unincorporated affidavits. Regarding incorporated affidavits:

> An examination of federal court decisions regarding the incorporation of supporting documents into the warrant itself reveals that the courts will deem the warrant to be limited by the narrowly-tailored supporting affidavit if it is expressly incorporated by reference on the face of the warrant and accompanies the warrant. ***See***, ***e.g.***, ***United States v. Tracey***, 597 F.3d 140, 146-47 (3d Cir. 2010). "As with the particularity requirement, the primary purposes of this incorporation rule are to limit the officers' discretion as to what they are entitled to seize and inform the subject of the search what can be seized." ***Id***. (cleaned up).

***Young, supra*** at 927-28 (footnote omitted). Further, courts have permitted facially overbroad warrants to be cured by the narrower language of supporting affidavits "even if the affidavit is not expressly incorporated, if the authorities in fact confined their search to the scope of the affidavit rather than exerting the broader authority granted by the warrant itself." ***Id.*** at 929 (citing ***Commonwealth v. Carlisle***, 517 Pa. 36, 41-44, 534 A.2d 469, 472-73 (1987)).

Finally, "[e]vidence constitutes fruit of the poisonous tree, and must be suppressed, if it was obtained by 'exploitation' of the illegality … and so long as the taint of that illegality has not been purged." ***Commonwealth v. Shabezz***, 641 Pa. 92, 113-114, 166 A.3d 278, 290 (2017). "The general rule

excludes all evidence unlawfully seized, [as well as] the direct and indirect products of the illegality." ***Commonwealth v. Santiago***, 653, Pa. 183, 210, 209 A.3d 912, 928 (2019).

Here, we reiterate that the certified record is devoid of the notes of testimony from the suppression hearing. Nevertheless, the court offered the following summary of Detective Bleiler's testimony, which Appellant does not challenge on appeal:

> Detective Bleiler, the affiant on the criminal complaint as well as the six (6) search warrants in question, testified to the investigative work needed to prepare and obtain the warrants. She indicated, although the face of the first Zmodo hard drive search warrant (herein referred to as Zmodo 1) stated "any and all" footage, she only asked for and received from Detective Lynch footage from approximately 11:30 p.m. on December 3, 2021-8:00 a.m. on December 4,2021, the date of the 911 call by [Appellant]. Detective Bleiler also testified she obtained the second search warrant for the Zmodo hard drive (herein referred to [as] Zmodo 2) after investigation and a concern of ongoing domestic violence in the home that she could date to October 2021.
>
> As to the SimpliSafe search warrants, Detective Bleiler testified, although the warrant requested only three specific days of video, SimpliSafe unilaterally provided thirty (30) days of video. Detective Bleiler stated she prepared the second SimpliSafe warrant seeking the entire thirty (30) days she already received but had not reviewed in order to further investigate the allegations of ongoing domestic violence.

(Suppression Court Opinion, 6/7/23, at 5).

The suppression court noted, regarding the first Zmodo warrant:

> The first Zmodo search warrant (12/6/21), Commonwealth Exhibit 2 (C-2), provides: "[Z]modo Network Recorder

- 22 -

(NVR) – any and all data files including video/audio recordings within[."] Even though the search warrant application supplies the precise language .... which [Appellant] objects to, the inquiry does not end here. Rather, pursuant to the holding in **Young**[*,*] ***supra***, when a search warrant application specifically incorporates supporting documentation, such as an affidavit of probable cause, limiting language contained therein may cure the warrant's facial defects. [***See Young, supra*** at 927-28].

Here, the first page of the warrant application clearly incorporated the affidavit of probable cause, as indicated by the "checked" box and attached affidavit. The body of the affidavit provides the following relevant information: [Appellant] informed Officer Michinock, he and the victim were out at the Black Horse Tavern on the night of December 3, 2021 and returned home at approximately 11:00 p.m. [Appellant] further stated he and the victim continued to drink at the home before he went to bed at approximately 12:00 a.m. [Appellant] stated at approximately 6:30 a.m. he noticed victim was not in bed and discovered her in the living room on the floor. The affidavit further provided "[a] friend .... advised there were cameras set up inside the residence that were connected to a hard drive and activated." The affidavit also indicated that medical personnel believed Ms. Meenan's injuries were as a result of an assault.

The affidavit's "Conclusion" states: "[T]here is probable cause to believe a search of the Zmodo hard drive will further the investigation and provide evidence as to the events that led up to Meenan's assault, the event of the assault, and hours following the assault." ***See***, C-2. The affidavit makes clear, the events leading up to the victim's assault began on December 3, 2021 at approximately 11:00 p.m. and the hours following the assault go to approximately 8:00 a.m., when [Appellant] was driven to the police station by Officer Michinock.

As stated above, [**Young**] expressly held the limiting language of supporting documents may cure a warrant's facial defect if the authorities in fact confined their search to the scope of the affidavit rather than the broader authority granted by the warrant. [***See Young, supra***]. Detective

- 23 -

Bleiler credibly testified she requested, and Detective Lynch only provided, recordings from December 3, 2021 to December 4, 2021 between approximately 11:00 p.m. and 8:00 a.m. Detective Bleiler explicitly testified she did not request or review any other dates or times for any audio/video recordings from the Zmodo system pursuant to the first search warrant. Detective Blelier's testimony is supported by Commonwealth Exhibit 8 (C-8), which has been admitted without objection. The report unambiguously states, "[O]n December 6, 2021, I reviewed the Zmodo [NVR] Hard Drive recordings from December 3, 2021 – December 4, 2021 between the hours of 11:35 PM and 08:00 AM." *See*, C-8. The [c]ourt finds Detective Bleiler's testimony to be credible and supported by her report.

(Suppression Court Opinion, 6/7/23, at 15-17). We agree with the suppression court's analysis that the affidavit was incorporated into the warrant, that the affidavit included limiting language, and that the search did not exceed those limiting parameters. *See Young, supra*.

Regarding the second Zmodo search warrant,[11] the suppression court observed:

The second Zmodo search warrant (1/6/2[2]), Commonwealth Exhibit 3 (C-3), provides: "[Z]modo [NVR] – any and all data files including video/audio recordings stored within between the dates on October 1, 2021 through December 2021." *See*, C-3. As with "Zmodo 1[,"] [Appellant] argued the use of "any and all" language is unreasonably broad and authorizes an illegal, general search. Again, despite [Appellant's] objection to the use of this language, [the court's] determination necessarily requires examination of this incorporated affidavit of probable cause.

_____

[11] In Appellant's omnibus pre-trial motion, Appellant challenged only the December 6, 2021 Zmodo warrant (Zmodo 1), as well as the December 6, 2021 SimpliSafe warrant (SimpliSafe 1). Arguably, this is an additional ground for the waiver of Appellant's challenges to the later warrants.

Similar to the process and analysis in the Zmodo 1 warrant application, the warrant application for Zmodo 2 likewise incorporated the attached affidavit of probable cause. ***See***, C3. The body of the affidavit is also substantially the same as the Zmodo 1 search warrant with the addition of information concerning specific incidents of past abuse made known to the police through further investigation. In particular, the incorporated affidavit describes conversations between the victim and a friend concerning [Appellant's] abuse, several incidents of abuse that occurred in November 2021 as described by a co-worker, and a single incident of abuse that occurred in October 2021 as described by a different co-worker. All of these events pre-dated December 4, 2021 and provide probable cause to search for additional evidence of domestic violence.

The affidavit's "Conclusion" once again provides further limiting language which must be considered in determining the validity of the warrant. The Conclusion provides: "[T]here is probable cause to believe that further search of the Zmodo hard drive data will provide more evidence of the abuse that Meenan endured while living with [Appellant]." ***See,*** C-3. The additional details contained in the body of the affidavit, the specificity contained in the "Conclusion" of the affidavit, and the description in the warrant application itself establishes the warrant's validity.

Although the face of the warrant requests "any and all data" between October 1, 2021 through December 2021, the language in the affidavit and the undisputed facts limited the search to evidence of abuse the victim endured while living with [Appellant]. As indicated in Detective Bleiler's incident report and admitted without objection as Commonwealth Exhibit 9 (C-9), the search was in fact confined to video recordings from October 1, 2021 through December 3, 2021. ***See,*** C-9. In further support of a concern for domestic violence, the affidavit of probable cause expressly states police responded to the victim and [Appellant's] home on October 13, 2021 for a wellbeing check based on a co-worker's concerns when victim did not show up for work. The pattern and history of abuse established in the affidavit of probable cause provides ample information to reasonably believe evidence of abuse would

be found on the hard drive.

(Suppression Court Opinion, 6/7/23, at 17-19). We agree with the suppression court that the affidavit was incorporated into the warrant, that the affidavit included limiting language, and that the search did not exceed those limiting parameters. *See Young, supra*.

With regard to the SimpliSafe warrants, the suppression court observed:

> The first SimpliSafe search warrant (12/6/21), Commonwealth Exhibit 4 (C-4), provides:
>
>> [A]ll records including but not limited to: video, audio, text, and any other account data maintained by SimpliSafe, Inc. concerning the following account holder for the dates of December 2, 2021 through December 5, 2021:
>>
>> 1. [Appellant] …
>
> *See*, C-4.
>
> Once again, as with Zmodo search warrants, [Appellant] claimed the December 6, 2021 SimpliSafe warrant was unconstitutionally overbroad. [Appellant] based his argument on the fact the Commonwealth received records directly from SimpliSafe pertaining to the SimpliSafe recorder from November 2, 2021 through December 5, 2021. He did not allege the Commonwealth improperly searched the records provided by SimpliSafe, rather the warrant was overbroad and resulted in the Commonwealth receiving substantially more information than the search warrant approved.
>
> Following the same analysis as above, we first acknowledge the search warrant incorporated the attached affidavit of probable cause. Second, the body of the affidavit contains substantially the same information as the December 6, 2021 Zmodo warrant with a few variations but inclusive of the scene of the home upon police arrival and the conclusion of the emergency room physician. Specifically, the affidavit

describes the positioning of the SimpliSafe recorder, in the kitchen facing the living room area and the active status of said recording system. The "Conclusion" provides: "There is probable cause to believe that a search of [Appellant's] SimpliSafe account will yield evidence of the crimes of aggravated assault and murder and provide clarification as to the events that led up to [Ms. Meenan's] assault, the event of the assault and hours following the assault." *See,* C-4.

A plain reading of the description of items to be searched unambiguously indicates the data to be provided from the SimpliSafe recorder included all records from December 2, 2021 through December 5, 2021. Despite the specific dates included in the warrant and the specific dates the Commonwealth requested from SimpliSafe, the Commonwealth received considerably more information than requested. Detectives Bleiler and Lynch credibly testified they did not view any data outside of the three days listed in the warrant application and immediately informed District Attorney Kathleen Wright. When a search of the data was performed, only December 2, 2021 through December 5, 2021 were searched.

(Suppression Court Opinion, 6/7/23, at 19-21). We agree with the suppression court that the affidavit was incorporated into the warrant, that the affidavit included limiting language, and that the search did not exceed those limiting parameters. *See Young, supra*.

Finally, with regard to the second SimpliSafe warrant, Appellant fails to meaningfully develop his argument with citations to appropriate legal authority or to the record and has waived it on this additional ground. *See, e.g., Commonwealth v. Armolt*, ___ Pa. ___, ___, 294 A.3d 364, 377-79 (2023) (noting where appellate brief fails to provide any discussion of claim with citation to relevant authority or fails to develop issue in any other meaningful fashion capable of review, that claim is waived; appellate court is

not required to make appellant's arguments for him). **See also** Pa.R.A.P. 2119(a). Even if not waived, this claim would not warrant relief.

Here, the court noted that Appellant did not advance a separate overbreadth claim but argued that the evidence must be suppressed as fruit of the poisonous tree. (**See** Suppression Court Opinion, 6/7/23, at 20). However, as the court had found that the first warrant contained appropriate limiting language, there was no need to suppress evidence seized as a result of the second warrant. (**See id.**). We agree that the court properly denied Appellant's suppression motion on the aforementioned grounds. Therefore, even if Appellant had preserved his suppression challenge by including the suppression hearing transcript in the certified record on appeal and even if he had preserved all arguments advanced on appeal before the suppression court, those claims would merit no relief in any event.

In Appellant's second issue, he challenges the sufficiency of the evidence to support his conviction for first-degree murder.[12] Appellant argues that the Commonwealth's forensic pathologist, Dr. Gary Collins, testified that Ms. Meenan's cause of death was cardiac arrest, and that drugs and alcohol contributed to the cause of death. According to Appellant, Dr. Collins stated that he was unable to determine whether the physical trauma Ms. Meenan had suffered, or the cocaine intoxication, specifically caused the arrhythmia which ultimately led to her death. On this basis, Appellant suggests that the

_____

[12] Appellant does not challenge the sufficiency of the evidence to support his convictions for aggravated assault, simple assault, or REAP.

evidence was insufficient to prove causation, and concludes that this Court must vacate his conviction and sentence for first-degree murder. We disagree.

Initially, we note that the trial court found that Appellant waived his sufficiency challenge due to his failure to identify which element of the crime the Commonwealth had not proven beyond a reasonable doubt. (*See* Trial Court Opinion, 12/4/24, at 16-17). Nevertheless, our review of Appellant's Rule 1925(b) statement indicates that Appellant claimed there was insufficient evidence that Appellant committed murder by **causing** the death of the decedent. As causation is an element of the definition of a criminal homicide and, accordingly, first-degree murder (*see* 18 Pa.C.S.A. § 2501(a)), we will review the merits of Appellant's sufficiency issue.

Appellate review of a challenge to the sufficiency of the evidence is governed by the following principles:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the

above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [finder] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Jones*, 874 A.2d 108, 120-21 (Pa.Super. 2005) (quoting

*Commonwealth v. Bullick*, 830 A.2d 998, 1000 (Pa.Super. 2003)).

The Crimes Code defines criminal homicide as follows:

### § 2501. Criminal Homicide

**(a) Offense defined**.—A person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being.

18 Pa.C.S.A. § 2501(a).

The Crimes Code defines first-degree murder as follows:

### § 2502. Murder

**(a) Murder of the first degree.**—A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

18 Pa.C.S.A. § 2502(a).

To find a defendant guilty of first-degree murder a jury must find that the Commonwealth has proven that he or she unlawfully killed a human being and did so in an intentional, deliberate and premeditated manner.

It is the element of a willful, premeditated and deliberate intent to kill that distinguishes first-degree murder from all other criminal homicide. ...

The *mens rea* required for first-degree murder, specific intent to kill, may be established solely from circumstantial evidence.

*Commonwealth v. Schoff*, 911 A.2d 147, 159-60 (Pa.Super. 2006) (internal

citations and quotation marks omitted). As noted above, Appellant's argument focuses on causation, specifically his contention that Ms. Meenan's heart stopped due to alcohol and cocaine intoxication, and not Appellant's prolonged and brutal assault.

The Crimes Code defines the casual relationship as follows:

> **§ 303.  Causal relationship between conduct and result**
>
> **(a) General rule.—**Conduct is the cause of a result when:
>
>> (1) it is an antecedent but for which the result in question would not have occurred; and
>>
>> (2) the relationship between the conduct and result satisfies any additional causal requirements imposed by this title or by the law defining the offense.

18 Pa.C.S.A. § 303.

To prove causation in homicide matters, the Commonwealth "must prove a direct causal relationship between the defendant's acts and the victim's death." *Commonwealth v. Rementer*, 598 A.2d 1300, 1304 (Pa.Super. 1991). "Put another way, if the fatal result was an unnatural or obscure consequence of the defendant's actions, our sense of justice would prevent us from allowing the result to impact on the defendant's guilt." *Id.* at 1306-07. In criminal matters,

> not only do we demand that the defendant's conduct actually cause the victim's death in that "it is an antecedent but for which the result in question would not have occurred," we also question, in cases such as the instant one, whether the fatal result was so extraordinary, remote or attenuated that it would be unfair to hold the defendant

criminally responsible for it.

*Id.* at 1306 (citations and footnotes omitted).  Therefore, to establish criminal causation, "the Commonwealth must prove that the defendant's conduct was so directly and substantially linked to the actual result as to give rise to the imposition of criminal liability."  ***Commonwealth v. Long***, 624 A.2d 200, 203-04 (Pa.Super. 1993) (citing ***Rementer***, 598 A.2d at 1304).  In summary,

> In ***Rementer***, we set forth a two-part test for determining criminal causation.  First, the defendant's conduct must be an antecedent, but for which the result in question would not have occurred.  ***Rementer***, 598 A.2d at 1304; 18 Pa.C.S.A. § 303(a)(1).  A victim's death cannot be entirely attributable to other factors; rather, there must exist a "causal connection between the conduct and the result of conduct; and causal connection requires something more than mere coincidence as to time and place."  ***Rementer***, 598 A.2d at 1305 n.3 (quotation omitted).  Second, the results of the defendant's actions cannot be so extraordinarily remote or attenuated that it would be unfair to hold the defendant criminally responsible.  ***Id.*** at 1305.
>
> As to the first part of the test, the defendant's conduct need not be the only cause of the victim's death in order to establish a causal connection.  ***Id.***  "Criminal responsibility may be properly assessed against an individual whose conduct was a direct and substantial factor in producing the death even though other factors combined with that conduct to achieve the result."  ***Long***, 624 A.2d at 203[.]  The second part of the test is satisfied when the victim's death is the natural or foreseeable consequence of the defendant's actions.

***Commonwealth v. Nunn***, 947 A.2d 756, 760 (Pa.Super. 2008) (some citations and quotations omitted).

Instantly, the evidence and Dr. Collins' testimony clearly established both a causal connection between Appellant's conduct and the result of that

conduct, and that Ms. Meenan's death was both the natural and foreseeable consequence of Appellant's actions. As discussed extensively above, video surveillance established that, over the course of over two and a half hours, Appellant repeatedly and brutally beat Ms. Meenan.

Further, Dr. Collins' testimony was that Ms. Meenan had died as the result of a criminal homicide. (*See* N.T. Trial, 2/8/24, at 254). Dr. Collins determined that her cause of death was cardiac arrest, following a physical assault while intoxicated with cocaine and ethanol. (*See id.* at 244). Regarding the cause of death, Dr. Collins testified:

> Fatal cardiac arrhythmias can occur in a setting of severe physical stress. Such stress can be caused by severe beating or physical assault. The toxic effects of cocaine include tachycardia, which means accelerated heart rate, coronary vasospasm, which is spasm of the coronary arteries and that's a mechanism that I cannot see, cardiac arrythmias, hypertension, strokes and death. Cocaine intoxication can also increase the risk of cardiac arrhythmia during physical stress. The effects of ethanol intoxication include euphoria, lowered social inhibitions, decreased coordination, slurred speech, vomiting and sedation.
>
> Based on the review of the video surveillance, postmortem examination findings, and toxicological analysis, the cause of death is determined to be cardiac arrest following physical assault while intoxicated with cocaine and ethanol.

(*Id.* at 247-48). When asked to explain, Dr. Collins testified at length that Ms. Meenan had **no** medical condition, beyond her physical injuries, that would have caused her death. (*Id.* at 252). She had no cardiac defects; her heart was normal. (*Id.* at 252). Although Ms. Meenan did not have heavy internal bleeding and her organs were intact, Dr. Collins further explained:

- 33 -

With the drugs in her system, it appears that she didn't take drugs after the last incident, and so, the drugs were circulating in her system while all of this beating was taking place. If she died of drugs, she would have been dead first and then all of those injuries that we saw would not have been present on her body.

And then the last thing that I used was .... the fact that after the last incident, there was no purposeful movement of [Ms. Meenan]. And so, after that, she died from her injuries or the combination of her injuries and the drugs.

(*Id.* at 252-53). Dr. Collins further noted that, on the video surveillance, there was a point in the continuous assault where Ms. Meenan was "placed" in a position by Appellant and did not move after. (*Id.* at 244).

Ultimately, Dr. Collins opined that the injuries he had observed on Ms. Meenan's body, even without the influence of cocaine, would have been sufficient to cause Ms. Meenan's death. (*Id.* at 254). Thus, Dr. Collins opined within a sufficient degree of medical certainty, that based upon his autopsy findings, the toxicology report, and the video surveillance of Ms. Meenan's death, that her cause of death was cardiac arrest following physical assault while intoxicated.[13] (*Id.* at 244, 275).

_____

[13] Appellant cites **Commonwealth v. Embry**, 441 Pa. 183, 272 A.2d 178 (1971) to support his argument that his actions were not a direct and substantial factor in causing Ms. Meenan's death. In **Embry**, a 71-year-old woman suffered a heart attack during a purse-snatching. At trial, the medical examiner opined that, although the victim had a past history of heart disease and prior heart attacks, that the heart attack that killed the victim was caused by the physical and emotional stress of the robbery. **See id.** However, on cross-examination, the medical examiner admitted that he was **not** convinced beyond a reasonable doubt that the struggle produced stress which, in turn, could have resulted in a heart attack. **Id.** Under those circumstances, our
*(Footnote Continued Next Page)*

As noted in **Rementer** and **Nunn**, the defendant's conduct need not be the **only** cause of the victim's death to establish a causal connection. **See Nunn, supra**; **Rementer, supra**. Rather, the Commonwealth was required only to show that (1) Appellant's conduct was a "direct and substantial factor" in producing Ms. Meenan's death; and (2) that Ms. Meenan's death was a natural and foreseeable consequence of Appellant's actions. **See id.** Based upon Dr. Collins' testimony and the surveillance video footage, the evidence was sufficient to demonstrate that Appellant's conduct was a direct and substantial factor in producing Ms. Meenan's death. Further, Ms. Meenan's death, following Appellant's prolonged beating and dropping of heavy furniture on top of her, was a natural and foreseeable consequence of those actions. **Id.** Therefore, viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, the evidence was sufficient to support a finding that Appellant caused Ms. Meenan's death to sustain his conviction for first-degree murder. **See Jones, supra**. Accordingly, we affirm.

Judgment of sentence affirmed.

_____

Supreme Court concluded that the Commonwealth had failed to establish causation. **Id.**

**Embry** is easily distinguishable from the facts of the case before us: not only was Ms. Meenan otherwise healthy and with no history of heart issues, but Dr. Collins was also unequivocal and confident in his testimony regarding her cause of death.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>6/17/2025</u>